IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION

WINNIE THOMPSON,
    Plaintiff,

v.                                              Case No. 3:10cv318/RS/EMT

CINCINNATI INSURANCE COMPANY,
    Defendant.
_____/

**O R D E R**

       This cause is before the court upon the amended motion of Robert Kerrigan ("Kerrigan"), a nonparty to this action, to quash in part a subpoena duces tecum issued to him by Defendant Cincinnati Insurance Company ("Cincinnati") (*see* Doc. 30). Also before the court are Cincinnati's response in opposition to the motion to quash (Doc. 32); Kerrigan's Motion for Leave to File a Reply, which motion shall be granted; and Kerrigan's attached reply (*see* Doc. 33 & Attach.). For the reasons set forth below, the court concludes that Kerrigan's motion to quash should be denied.

       Background

       Plaintiff, Winnie Thompson ("Thompson"), filed this insurance bad-faith action against Cincinnati on August 20, 2010, in the First Judicial Circuit in and for Escambia County, Florida. Thompson generally alleges she has been exposed to a judgment in the amount of $3,642,750 as a result Cincinnati's bad-faith handling of an automobile liability claim against her (*see* Doc. 1, Attached Complaint)). The action was properly removed to this court, as it is a civil action between citizens of different states and the matter in controversy exceeds $75,000, exclusive of interest and costs (*see, e.g.*, Doc. 1 (Notice of Removal)).

       In relevant part, Thompson alleges the following facts in support of her complaint (*see* Doc. 1, Attached Complaint). Cincinnati issued an automobile insurance contract ("contract" or "policy") to Thompson that insured her 1995 Mercury Grand Marquis ("the Mercury"). The contract was

intended to cover and indemnify Thompson for bodily injury liability arising out of the operation of the Mercury, to the extent of the bodily injury liability limits (i.e., $100,000 per person and $300,000 per occurrence); the contract also provided coverage for certain property damages. On October 15, 2007, while the contract was in effect, Thompson was operating the Mercury and entered a roadway in the path of Ronald Chavers ("Mr. Chavers"), a helmeted operator of a motorcycle, and collided with him resulting in serious bodily injury to Mr. Chavers and his death three days later, on October 18, 2007. Thompson's accident was covered for liability protection under the terms of the contract.[1]

Thompson alleges she notified Cincinnati of the accident on October 15, 2007, and her claim was assigned to Dave DeMara, an adjuster with Cincinnati, for investigation and settlement of the claim. According to Thompson, Mr. DeMara learned on the day of the accident that Mr. Chavers was catastrophically injured and likely to die. She further alleges that within forty-eight hours of the accident, Cincinnati determined that Thompson was at fault (which determination was corroborated on October 25, 2007, Thompson alleges, when Cincinnati learned that the "original traffic citation issued to [Thompson] for failure to yield was reissued, confirming that law enforcement's investigation had concluded that [Thompson] was at fault") and that Mr. Chavers' injuries were very severe, and therefore, Cincinnati reserved the $100,000 policy limits. And, within seventy-two hours of the accident, Cincinnati examined Mr. Chavers' motorcycle and determined it was heavily damaged, Cincinnati learned that Mr. Chavers died, and Thompson's counsel at the time provided to Cincinnati a letter in which Thompson expressed her desire that the policy limits be paid to the Chavers family on her behalf in exchange for a full release of liability. However, at no time prior to service of a wrongful death suit on Thompson (by Katie Salina Chavers ("Mrs. Chavers"), as personal representative of Mr. Chavers' estate) did Cincinnati offer to settle with the

---

[1] With regard to specific terms of the contract, Thompson alleges in relevant part that: 1) the contract provides that if legal proceedings are taken to enforce a claim against her under the contract, Cincinnati must—at its own expense—undertake the defense of such legal proceedings on Thompson's behalf, and 2) under the terms of the contract Cincinnati holds "complete control of the defense and settlement of any such claim, and [Thompson] was prohibited from settling any claim without the knowledge or consent of [Cincinnati], except at [Thompson's] own costs" (*see* Doc. 1, Attached Complaint at 2 ¶¶ 7, 8).

Chavers family by payment of the policy limits; nor did Cincinnati offer to pay for property losses regarding the motorcycle.[2] This is so, Thompson alleges, despite Cincinnati's maintaining full and exclusive control over handling, settling, investigating, and defending the claim. Mrs. Chavers' wrongful death lawsuit proceeded to a jury trial and resulted in a verdict against Thompson, on April 6, 2010, in the amount of $3,642,750. As a result of Cincinnati's failure to act fairly on her behalf, Thompson asserts, she is now liable for a judgment greatly in excess of the policy limits.

Finally, in support of her general allegation that Cincinnati failed to act fairly on her behalf, Thompson asserts eight specific allegations, including—relevant to the instant dispute—first, that "[Cincinnati] misrepresented to [Thompson] that it had made reasonable efforts to resolve the claims arising from the Chavers accident, and that it was unable to take further steps to protect [Thompson] from the risk of an excess judgment," and second, that "[Cincinnati] failed to communicate to the Chavers family that the policy limits were $100,000 for bodily injury and to promptly offer the full limits to settle Chavers' claim; instead [Cincinnati] simply sent offers for Mrs. Chavers to call Mr. DeMara to discuss 'any' claims she 'might' have, without offering her the [] policy limits" (*see* Doc. 1, Attached Complaint, at 4–5 ¶¶ 22(d), (f)).

<u>Instant Dispute</u>

The subpoena duces tecum at issue is directed to Kerrigan, a nonparty to the instant suit but Mrs. Chavers' attorney in the underlying wrongful death suit, and it seeks documents responsive to five requests (*see* Doc. 30, Ex. A). Only the first request is in dispute here, that is, Cincinnati's request that Kerrigan produce "all calendars, planners, appointment books and similar documents that reflect the date(s) and time(s) of meetings, conferences and/or telephone calls with Katie Salinas Chavers between October 15, 2007, and July 10, 2008" (*see* Doc. 30 at 1 & Ex. A). Cincinnati contends the documents are relevant to the claims and defenses asserted in the instant action and that the documents are not subject to the attorney-client privilege.

---

[2] The complaint alleges that Mrs. Chavers filed the wrongful death suit against Thompson on April 8, 2008, and that the suit was served on Thompson in July of 2008 (*see* Doc. 1, Attached Complaint, at 3 ¶ 18).

Case No.: 3:10cv318/RS/EMT

More specifically, regarding the relevancy of the documents, Cincinnati contends that its defense rests, in part, upon the fact that Mr. DeMara made reasonable and prudent efforts to investigate and settle the wrongful death claim, which efforts included his repeated attempts to contact the Chavers family. These attempts—Cincinnati asserts—were made "with the full intent to settle the claims arising out of the motor vehicle accident at issue for the full policy limits" (Doc. 32 at 2).[3] With one exception, however, Mrs. Chavers failed or refused to respond to any of Mr. DeMara's communications (*id.*).[4] As previously noted, the wrongful death action was filed on April 8, 2008, the day after Mrs. Chavers' lone attempt to contact Mr. DeMara. Cincinnati contends neither Mr. DeMara nor Thompson was "informed of the commencement of the [wrongful death] suit" and that Mr. DeMara did not learn a suit had been filed until July 7, 2008 (*see id.* at 6, 7). Thereafter, on July 10, 2008, Cincinnati tendered its policy limits to Mr. Chavers' estate, but the tender was later rejected (*see id.* at 7). Cincinnati contends, based on the foregoing facts, as follows:

> . . . that, with the exception of a single voice mail left with Mr. DeMara on April 7, 2008, [it is undisputed that] Mrs. Chavers never responded to any of Mr. DeMara's many telephone calls or letters prior to service of the wrongful death complaint upon Winnie Thompson. Similarly, it will be undisputed that Mrs. Chavers never made

---

[3] Cincinnati notes that Mr. DeMara's attempts included writing multiple letters and making repeated telephone calls to the Chavers family. To illustrate its point, Cincinnati has provided copies of letters sent by Mr. DeMara to Mrs. Chavers and her family, dated October 25, 2007, November 15, 2007, and June 25, 2008 (*see* Doc. 32 at 4, 5, 7). In the letters Mr. DeMara generally advises Mrs. Chavers that he is handling the claim, that he "welcomes" a call and/or requests a call to discuss "any claim" Mrs. Chavers or her family may have, and he provides his contact information, including a phone number, facsimile number, email address, and mailing address (*see id.*). The letters do not include an offer to settle, acknowledge liability on the part of Cincinnati's insured (Thompson), or state the policy limits (*id.*).

With regard to telephone calls, Cincinnati notes that Mr. DeMara is prepared to testify that on November 15, 2007, he called Mrs. Chavers to discuss the accident and left a voice mail message for her, but she did not return his call, and further, that he called again in 2008 on three occasions (January 10, April 1, and April 8), and on each occasion he left voice mail messages for Mrs. Chavers (*id.* at 5–6).

[4] Cincinnati notes that Mr. DeMara received a call from Mrs. Chavers on April 7, 2008, but it was in the "evening hours" and he missed her call; thus, Mrs. Chavers left a voice mail message (Doc. 32 at 6).

Case No.: 3:10cv318/RS/EMT

>a demand upon or against Winnie Thompson or Cincinnati Insurance Company for compensation for the wrongful death claim at issue prior to the commencement of the wrongful death action.

(*id.* at 8). Thus, Cincinnati argues, the documents it seeks from Kerrigan are relevant because—if they demonstrate that Mrs. Chavers met with an attorney prior to or contemporaneously with Mr. DeMara's multiple attempts to contact Mrs. Chavers—the jury could reasonably infer that she was deliberately refusing to respond to Mr. DeMara, which deliberate refusal is relevant to the reasonableness of Cincinnati's efforts to settle the wrongful death claim (*id.* at 10).

Kerrigan, in opposing Cincinnati's request for his appointment books and the like, asserts that the inference Cincinnati intends to argue to the jury (i.e., generally, that the contemporaneous timing of Mrs. Chavers' meetings or calls with Kerrigan infers that she was advised by Kerrigan to avoid Mr. DeMara) is an impermissible argument because it invades the attorney-client privilege. It also forces Mrs. Chavers to waive her attorney-client privilege because she will have to respond and "explain away" the suggestion asserted by Cincinnati (*see* Doc. 30 at 3).

Kerrigan also contends Cincinnati should not be permitted to argue to the jury that Mrs. Chavers "should have tried harder to contact Cincinnati's adjuster" (noting, in part, that Mr. DeMara's letters did not advise the Chavers family of the policy limits, offer those limits, or offer to pay for the damaged motorcycle[5]) because the focus in a bad-faith case such as this is on the actions of the insurer in fulfilling its obligations to the insured, not on the actions of the claimant (*id.* at 2–3, 6 (citations omitted)). Moreover, while acknowledging that Cincinnati could raise as a defense Mrs. Chavers' unwillingness to settle (if Cincinnati conclusively proves her unwillingness to settle for the policy limits), the dates and times of Mrs. Chavers' meetings with Kerrigan do not make it more probable or less probable that she was unwilling to settle (*id.* at 6). Thus, the information sought by Cincinnati would be of no probative value, other than possibly establishing the impermissible inference discussed *supra*. Finally, Kerrigan contends, if this court concludes that

---

[5] Cincinnati appears to have taken the position that Mr. DeMara's letters could not have included such information or offers to settle because, among other reasons, Mr. DeMara did not know the identity of the person authorized to settle the claim or sign a release (i.e., the personal representative of Mr. Chavers' estate).

the dates and times have some probative value, the danger of unfair prejudice, confusion of the issues, or misleading the jury substantially outweighs any probative value (*id.* at 6–7 (citing Fed. R. Evid. 403)).[6]

Controlling Law

- Attorney-Client Privilege

The attorney-client privilege protects the confidentiality of communications within the attorney-client relationship, not the external trappings of the relationship, such as facts relating to the creation or existence of the attorney-client relationship. Langer v. Presbyterian Medical Center of Philadelphia, Nos. 87-4000, 91-1814, 88-1064, 1995 WL 79520, at *13 (E.D. Pa. February 17, 1995), *opinion vacated on other grounds on reconsideration*, 1995 WL at 395937 (E.D. Pa. July 3, 1995) ("It is well-established that the 'structural framework,' or 'external trappings' of the attorney-client relationship, as opposed to the substantive communications made during the relationship, are not privileged . . . . Thus, existence of the relationship, dates and general subjects of meetings, and the identity of persons at those meetings, are not privileged information.") (citations omitted). Accordingly, the dates, times, and places of a client's meetings with his or her attorney are not protected. *See* Unites States v. Alexander, 37 F.3d 1501 (7th Cir. 1994) (unpublished) (telephone records revealing that call was made to attorney are not privileged; only the substance of such a telephone call is privileged);[7] United States v. Kendrick, 331 F.2d 110, 113 (4th Cir. 1964) ("It is the substance of the communications which is protected, however, not the fact

---

[6] In his reply Kerrigan reiterates and elaborates upon his arguments that: 1) the materials sought by Cincinnati are sought in an effort to shift the focus of this bad-faith action from the mindset and conduct of the insurer—which is the proper focus—to the mindset and conduct of the claimant; and 2) if the materials are disclosed, and Cincinnati makes the arguments it intends to make based on the materials, the jury will be confused and misled (*see* Doc. 33).

[7] The undersigned recognizes that Alexander is not considered binding precedent, since it is unpublished, and discusses the case only as persuasive authority. *See* 11th Cir. R. 36-2; *see also* United States v. Rosenthal, 763 F.2d 1291, 1294 n.4 (11th Cir. 1985) (citing an unpublished Seventh Circuit opinion as persuasive authority, even though a Seventh Circuit Rule prohibits a court in the Seventh Circuit from doing so, noting that the Eleventh Circuit is not bound by the rules of the Seventh Circuit); Hunt v. Dep't of Air Force, 149 F.R.D. 657, 661–62 (M.D. Fla. 1993) (citing Rosenthal and relying on an unpublished Seventh Circuit opinion as persuasive authority).

Case No.: 3:10cv318/RS/EMT

that there have been communications."); Colton v. United States, 306 F.2d 633, 637–38 (2d Cir. 1962) (information about fees received, as well as existence and time frame within which attorney-client relationship existed, not privileged); *see also* United States v. Jackson, No. 07-35/RWR/AK, 2007 WL 4225403, at *2 (D.D.C. November 30, 2007) ("The existence of a communication between a client and her attorney is not privileged, even if the content of that communication would otherwise be protected . . . . Therefore the e-mail transaction log, which shows e-mail traffic between Jackson and her attorney . . . is not protected by the attorney-client privilege and should be turned over to the government.") (citations omitted); Global HTM Promotional Group, Inc. v. Angel Music Group LLC, No. 06-20441Civ/Brown, 2007 WL 221423, at *2 (S.D. Fla. January 26, 2007) ("[T]he records that Plaintiff would like to exclude are not 'communications' between the attorney and the client. At most, the records show the times at which the attorney and/or the client communicated with each other, not the actual communications between the two parties."); Monroe's Estate v. Bottle Rock Power Corp., No. 03-2682, 2004 WL 737463, at *11 (E.D. La. April 2, 2004) (in general, retainer agreements, the identity of clients, the purposes for which attorneys are retained, information relating to billing or fee arrangements, hours spent by attorneys working on the litigation, and payment of attorney's fees do not fall within either the attorney-client or the work-product privilege) (citations omitted); Parker v. Kitzhaber, No. 88-1089-JU, 1989 WL 69960, at *1 (D. Or. June 8, 1989) ("The attorney-client privilege [protects the substance of communications between attorney and client and therefore] is inapplicable to the extent that the interrogatory seeks the names, addresses, telephone numbers, titles, and dates of contact with client representatives. The attorney-client privilege does not cover issues relating to the creation or existence of the attorney-client relationship."); Condon v. Petacque, 90 F.R.D. 53, 54 (N.D. Ill. 1981) (noting, in relevant part, that the attorney-client privilege "does not foreclose inquiry into the fact of representation itself or the dates upon which services are rendered as long as the substance of the attorney-client relationship is shielded from disclosures").

- Discoverable Information

The Federal Rules of Civil Procedure allow discovery of any relevant, non-privileged material that is admissible or reasonably calculated to lead to admissible evidence. Fed. R. Civ. P.

26(b)(1). And the overall purpose of discovery under the Rules is to require the disclosure of all relevant information so that the ultimate resolution of disputed issues in any civil action may be based on a full and accurate understanding of the true facts, and therefore embody a fair and just result. *See* United States v. Procter & Gamble Co., 356 U.S. 677, 682 (1958). Courts construe relevancy "broadly to encompass any matter that bears on, or that reasonably could lead to other matter[s] that could bear on, any issue that is or may be in the case." Oppenheimer Fund, Inc. v. Sanders, 437 U.S. 340, 351 (1978) (citing Hickman v. Taylor, 329 U.S. 495, 501 (1947)). Relevant information is discoverable even if it is not admissible at trial, "if the discovery appears reasonably calculated to lead to the discovery of admissible evidence." Fed. R. Civ. P. 26(b)(1). The Federal Rules of Civil Procedure strongly favor full discovery whenever possible. *See id.*; Moore v. Armour Pharmaceutical Co., 927 F.2d 1194, 1197 (11th Cir. 1991).

Additionally, "it is well settled that the scope of discovery under a subpoena is the same as the scope of discovery under Rule 26(b) and Rule 34. As such, a court must examine whether a request contained in a subpoena duces tecum is overly broad or seeks irrelevant information under the same standards set forth in Rule 26(b) and as applied to Rule 34 requests for production." Commissariat A L'Energie Atomique v. Samsung Elec. Co., No. 8:06mc44/T-30TBM, 2006 WL 5003562, at *2 (M.D. Fla. June 14, 2006) (footnote omitted); *see also* 9A Charles A. Wright and Arthur R. Miller, Federal Practice and Procedure § 2459 (3d ed. 2008) ("the matter sought by the party issuing the subpoena must be reasonably calculated to lead to admissible evidence as is required by the next to the last sentence of Rule 26(b)(1)"[8]).

<u>Discussion/Conclusion</u>

The issue in this bad-faith action is whether Cincinnati failed to act in good faith with regard to its handling of an automobile liability claim against Thompson, its insured. In asserting that it indeed acted in good faith, Cincinnati has presented information indicating that Mr. DeMara, its adjuster, attempted to contact Mrs. Chavers on numerous occasions, both by letters and telephone

---

[8] The next to the last sentence states, "Relevant information need not be admissible at the trial if the discovery appears reasonably calculated to lead to the discovery of admissible evidence." Fed. R. Civ. P. 26(b)(1).

Case No.: 3:10cv318/RS/EMT

calls, regarding any claim she or her family may have had relating the accident, and that Mrs. Chavers—for all intents and purposes—failed to respond to any of Mr. DeMara's attempts.[9] Cincinnati asserts that the timing of Mrs. Chavers meetings with Kerrigan is relevant because, if her meetings indeed coincide with Mr. DeMara's attempts to contact her, an inference may be drawn that she was deliberately refusing to respond to Mr. DeMara. Cincinnati also asserts that the documents it seeks are not protected by the attorney-client privilege. As to both of Cincinnati's assertions, the undersigned agrees, as discussed next (in reverse order).

First, the information Cincinnati seeks (that is, information reflecting the dates and times Kerrigan met, conferred, or otherwise communicated with Mrs. Chavers between October 15, 2007, and July 10, 2008), is clearly not protected by the attorney-client privilege, as such information does not disclose the substance of any communications between Mrs. Chavers and her attorney.

Second, the court finds that the information is relevant to the defenses asserted by Cincinnati—and/or—to those defenses Cincinnati wishes to assert at trial. Although Kerrigan argues that the information (and Cincinnati's expected arguments related thereto) is inadmissible at trial, it is not necessary to establish the admissibility of documents sought to be discovered because relevancy, rather than admissibility, is the test in determining whether evidence sought by a subpoena duces tecum is proper. Steamship Co. of 1949 v. China Union Lines, Hong Kong, Ltd., 123 F. Supp. 802, 805 (S.D.N.Y. 1954); United States v. E. I. Du Pont De Nemours & Co., 14 F.R.D. 341, 343–34 (N.D. Ill. 1953); 9A Charles A. Wright and Arthur R. Miller, Federal Practice and Procedure § 2459 (3d ed. 2008). And as previously discussed, relevancy is broadly construed in the context presented here. *See* Oppenheimer, 437 U.S. at 351. Stated another way, the issue presented at this juncture is whether the information sought by Cincinnati is relevant, even if it is not admissible at trial, and it is relevant as long as it appears to be "reasonably calculated to lead to

---

[9] Mrs. Chavers' attempt to contact Mr. DeMara in the evening hours of April 7, 2008 (the day before she filed the wrongful death suit), was likely not an earnest attempt to contact him, given that Mr. DeMara had been attempting to contact her since October 2007, she had never previously responded to any of his attempts, and she waited until the night before she filed suit to finally respond—and then did so only by calling Mr. DeMara at a time when it was unlikely he would be in his office.

Case No.: 3:10cv318/RS/EMT

the discovery of admissible evidence." Fed. R. Civ. P. 26(b)(1). It is for the District Court to determine the admissibility of evidence or the propriety of any argument or defense Cincinnati wishes to present at trial, and—at the appropriate time—to consider objections to those arguments or defenses (including those asserted here, such as an improper invasion of the attorney-client privilege, improper argument regarding the inference of the timing of Mrs. Chavers' communications with her attorney, or an improper or misguided focus by Cincinnati on Mrs. Chavers' conduct instead its own).[10]

Thus, Kerrigan's motion to quash will be denied. However, Kerrigan need not comply with Cincinnati's request to the extent it requires him to produce all calendars, planners, appointment books and similar documents that reflect the dates and times on which he met or spoke with Mrs. Chavers. Such documents will likely contain extraneous and irrelevant information, such as information pertaining to Kerrigan's other clients or his personal affairs. Although the extraneous information could be redacted, the undersigned concludes that a more expedient manner for providing the same information exists. Thus, Kerrigan may provide the substance of the information sought by Cincinnati in Request Number One of the subpoena duces tecum (that is, the date(s) and

---

[10] The undersigned expresses no opinion on whether the evidence is admissible, or related arguments permissible, but notes that they very well may be. In Alexander, 37 F.3d at 1501, the Seventh Circuit Court of Appeals, rejected—albeit in an unpublished opinion—an argument that the admission of telephone records, which reflected calls by a defendant to his attorney immediately after the defendant's questioning by a drug enforcement agent, created an impermissible inference as to the motive for the communication, noting as follows:

> Adopting [the defendant's] analysis would extend the current boundaries of the attorney-client privilege, and this court has held the attorney-client privilege is intended to be strictly confined within the narrowest possible limits consistent with the logic of its principle. [United States v.] Weger, 709 F.2d [1151,] []1154 [(7th Cir. 1994)] (quoting In re Horowitz, 482 F.2d 72, 81 (2d Cir. 1973), *cert. denied*, 414 U.S. 867). <u>We are not inclined to extend the attorney-client privilege to mere inferences and conclude the privilege was not violated by the admission of the telephone records</u>.

Alexander, 37 F.3d at 1501 (emphasis added) (internal quotations omitted). Thus, the information sought by Cincinnati may indeed be admissible, which further demonstrates the need for its disclosure at this juncture.

Case No.: 3:10cv318/RS/EMT

time(s) of any meetings, conferences and/or telephone calls with Katie Salinas Chavers between October 15, 2007, and July 10, 2008) in the manner specified by Cincinnati in the subpoena (with appropriate redactions), <u>or</u> he may provide the same information in another form, such as a typed list or other document that accurately reflects the information contained on his appointment books, calendars, and the like.

Accordingly, it is **ORDERED**:

1. Non-Party Robert Kerrigan's motion for leave to file a reply (Doc. 33) is **GRANTED**.

2. Non-Party Robert Kerrigan's Amended Motion to Quash (Doc. 30) is **DENIED**. Kerrigan shall respond to the subpoena duces tecum, as outlined in the body of this order, within **FOURTEEN (14) DAYS** of the date of docketing of this order.

**DONE AND ORDERED** this 9th day of November 2010.

/s/ *Elizabeth M. Timothy*
**ELIZABETH M. TIMOTHY**
**UNITED STATES MAGISTRATE JUDGE**